February 18, 1992

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

DIANA C. FERREIRA,　　　　　　　)　　APPEAL NO. 90-047
　　　Plaintiff/Appellant,　　　)　　CIVIL ACTION NO. 86-796
　　　　　　　　　　　　　　　　　)
　　　　　　vs.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　) ·　OPINION
ROSALIA MAFNAS BORJA, <u>et al</u>., )
　　　Defendants/Appellees.　　　)
_____)

Argued March 12, 1991

Counsel for Plaintiff/Appellant:　Carlsmith Ball Wichman
　　　　　　　　　　　　　　　　　　　Murray Case Mukai & Ichiki
　　　　　　　　　　　　　　　　　　　P. O. Box 241 CHRB
　　　　　　　　　　　　　　　　　　　Saipan, MP　96950

Counsel for Defendants/Appellees:　Theodore R. Mitchell
　　　　　　　　　　　　　　　　　　　P. O. Box 2020
　　　　　　　　　　　　　　　　　　　Saipan, MP　96950

BEFORE:　DELA CRUZ, Chief Justice, BORJA, Justice, and KING,
　　　　　Special Judge.

BORJA, Justice:

Diana C. Ferreira (hereafter Diana), a person of Northern Mariana Island descent (hereafter NMI descent), filed a quiet title action against defendants Rosalia Mafnas Borja, Isidora Mafnas Salas, and Isabel Mafnas Santos (hereafter Mafnas sisters). The Mafnas sisters were the sellers of three parcels of land to Diana. The lots are described as Lot Nos. 008 B 22, 23, and 24, containing a total area of 21,182 square meters, more or less. The

517

Mafnas sisters filed an answer denying ownership in Diana and affirmatively stating that the acquisition of the land by Diana violated Article XII of the NMI Constitution.

Both parties filed motions for summary judgment. The trial court granted summary judgment in favor of the Mafnas sisters holding that the acquisition of the land by Diana violated Article XII of the NMI Constitution.

Diana appeals. We affirm the decision of the trial court.

## FACTS

The series of transactions at issue in this case commenced with a 1980 Partnership Agreement (hereafter Agreement). James and Bobbi Grizzard (husband and wife) (hereafter the Grizzards) and Frank F. and Diana C. Ferreira (husband and wife) (hereafter the Ferreiras) executed this Agreement. The sole purpose of the partnership was to purchase "for sale, lease and development the property described above as part of Lot 008 B 10 . . . ." Agreement, Article One.[1]

The Grizzards would contribute $41,000 to the partnership.

---

[1] The partnership agreement deals with only one piece of property. However, appellant's brief, at page 14, acknowledges that the other two properties were acquired using funds from the Grizzards. Appellant states also that Diana used the real estate expertise of Frank in acquiring the properties. While it may be true that she relied on Frank's expertise in the purchase of the properties, there is nothing in the record that indicates that Frank's expertise was part of the consideration accepted by the Mafnas sisters in conveying their interests. Consequently, such a fact is irrelevant as to the issue of who furnished the consideration for the purchase of the properties.

Frank F. Ferreira would contribute "all amounts needed for surveying, subdividing, legal fees, and accounting services to the partnership, such services being of the approximate amount of Nine Thousand Dollars ($9,000.00)." Agreement, Article Four.

In Article Four, also, it is provided that Diana,

> as a citizen of Northern Mariana descent will purchase the property described . . . with the $41,000 contributed by [the Grizzards]. Upon the purchase of the described real property, [Diana] will execute a lease of the real property to the partnership, for the maximum period of time allowed by law, being forty (40) years and to include a "change of law" provision for purchase in fee simple absolute should the law change with the consideration for this provision being the $41,000 paid in hand and the mutual promises contained in this agreement. In addition, the lease will contain a provision for the purchase of improvements put on the land by the lessee.

Diana acquired fee title but she never granted the partnership the short-term leases required by the Agreement. Instead, Diana used additional funds from James Grizzard to acquire two additional adjacent parcels, taking fee title in herself. The three parcels were purchased for about one hundred thousand dollars ($100,000).

On March 25, 1988, in a document entitled, "Quitclaim, Release of Claims, and Assignment," Nansay Micronesia, Inc. acquired the Grizzards' interests in the three parcels of land, and all other rights they had under the Agreement. The consideration paid for all the Grizzards' interests was one million one hundred thousand dollars ($1,100,000). On the same day, Nansay Micronesia, Inc. assigned the interests it acquired from the Grizzards to the

Ferreiras.

Also on March 25, 1988, Diana entered into an agreement to lease with Nansay for fifty-five years. The consideration for the agreement to lease was the assignment by Nansay Micronesia, Inc. of its interests in the three parcels of land and in the Agreement to the Ferreiras. Concurrently, Diana agreed to convey her fee simple interest in the three parcels of land to Ana Little for $60,000.

## ISSUES PRESENTED

1. Whether the trial court committed reversible error in granting summary judgment in favor of the Mafnas sisters where the record before it presented multiple genuine issues as to material facts, by weighing conflicting evidence of record, resolving material factual disputes without trial and assessing the credibility of deposition evidence without having heard testimony.

2. Whether the trial court committed reversible error in concluding that the Grizzards and Frank Ferreira acquired a constitutionally impermissible interest in NMI land when Diana purchased the land from the Mafnas sisters.

3. Whether, as applied to this case, Article XII of the Constitution of the Northern Mariana Islands violates Diana's right to equal protection of the laws as guaranteed her by the Fourteenth Amendment to the Constitution of the United States.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. If there is

520

no genuine issue of material fact, the analysis shifts to whether the substantive law was correctly applied. Commonwealth Ports Authority v. Hakubotan Saipan Enterprises, Inc., No. 90-005 (N.M.I. Aug. 8, 1991). If an incorrect substantive law was applied, the appellate court should, in its de novo review, determine if the result is correct under a different theory. Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir. 1985); 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure: Civil 2d § 2716 (1983). The evidence and inferences are viewed in a light most favorable to the non-moving party. Cabrera v. Heirs of De Castro, No. 89-018, 1 N.Mar.I. 102 (June 7, 1990).

## ANALYSIS

### Summary Judgment and Article XII

We will address the first two issues jointly since a discussion of one requires a discussion of the other.

Our analysis starts with the pertinent constitutional provision. Article XII, as amended in 1985, is as follows:

ARTICLE XII

Section 1: Alienation of Land.
The acquisition of permanent and long-term interests in real property within the Commonwealth shall be restricted to persons of Northern Marianas descent.

Section 2: Acquisition.
The term acquisition used in section 1 includes acquisition by sale, lease, gift, inheritance or other means.

Section 3: Permanent and Long-Term Interests in Real Property.

521

The term permanent and long-term interests in real property used in Section 1 includes freehold interests and leasehold interests of more than fifty-five years including renewal rights . . ..

Section 4: Persons of Northern Marianas Descent.

A person of Northern Marianas descent is a person who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child or a person of Northern Marianas descent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.

Section 5: Corporations.

A corporation shall be considered to be a person of Northern Marianas descent so long as it is incorporated in the Commonwealth, has its principal place of business in the Commonwealth, has directors one-hundred percent of whom are persons of Northern Marianas descent and has voting shares (i.e. common or preferred) one-hundred percent of which are actually owned by persons of Northern Marianas descent as defined by Section 4. Minors, as defined by applicable laws of the Commonwealth, may not be eligible to become directors of a corporation. No trusts or voting by proxy by persons not of Northern Marianas descent may be permitted. Beneficial title shall not be severed from legal title.

Section 6: Enforcement.

Any transaction made in violation of section 1 shall be void ab initio. Whenever a corporation ceases to be qualified under Section 5, a permanent or long-term interest

> in land in the Commonwealth acquired by the
> Corporation after the effective date of this
> amendment shall be immediately forfeited
> without right of redemption to the government
> of the Commonwealth . . ..

Commonwealth Code, vol. 1, pp. B-334 & B-335.

For a person to succeed in a cause of action alleging a violation of Article XII, certain material facts have to be clearly present and undisputed. These facts are:

1. An acquisition of NMI land;

2. The acquisition is a permanent and long-term interest;

3. The acquisition was made by a person who is not of NMI descent.

To determine if the above necessary facts exist in this case, we must answer the question of whether the long-term and permanent interest acquired by Diana from the Mafnas sisters in Lot Nos. 008 B 22, 23, and 24 was, as a matter of law, a constitutionally impermissible acquisition by the Grizzards.

The following facts appear from the record:

1. Diana is a person of NMI descent;

2. The partnership of the Grizzards, Frank Ferreira and Diana is not recognized in the constitution as a person capable of owning a permanent and long-term interest in Commonwealth real property;

3. The Grizzards and Frank Ferreira are not persons of NMI descent;

4. Diana acquired in her name the properties from the Mafnas sisters with funds provided entirely by the Grizzards; and

5. The properties were acquired in furtherance of a partnership agreement between the Grizzards and the Ferreiras, dated October 21, 1980.

The above facts are undisputed material facts. These undisputed material facts are sufficient for purposes of a summary judgment proceeding involving a claim that Article XII of the NMI Constitution was violated.

The disputed genuine issues of material fact that Diana claims with regard to "control" over an agent are not relevant. The issue of control was discussed by the trial court in its agency analysis. As we discuss later, common law principles of trust are dispositive. The other disputed issue of material fact raised by Diana deals with the claim of ownership to the properties. Again, as we will note later, Diana cannot raise a genuine issue of fact by refuting in her deposition what is stated in the Agreement.

As we stated earlier, where there is no genuine issue of material fact, the analysis then shifts to whether the correct substantive law was applied, bearing in mind that the evidence and inferences are viewed in a light most favorable to the non-moving party. Cabrera v. Heirs of De Castro, supra.

The trial court, in its grant of summary judgment, concluded that Diana's acquisition of Lot Nos. 008 B 22, 23, and 24 from the Mafnas sisters "violated Article XII, Section 1 of the Constitution and is void ab initio under Section 6 thereof." Ferreira v. Borja, C.A. No. 86-796, "Order Re Motion and Cross-Motion for Summary

524

Judgment" at 28 (Super. Ct. Sept. 13, 1988). We initially examine this conclusion in view of the substantive law applied by the trial court. Commonwealth Ports Authority v. Hakubotan Saipan Enterprises, Inc., supra. If the incorrect substantive law was applied, we then must determine if the result is correct under a different theory of law. Ross v. Communications Satellite Corp., supra; 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure: Civil 2d § 2716 (1983).

The trial court applied principles of agency in arriving at its conclusion. Whether Diana is in fact an agent of the Grizzards and Frank is not dispositive. What is dispositive is whether Diana's acquisition of the properties, using funds provided entirely by the Grizzards, resulted in the acquisition by persons not of NMI descent of an impermissible interest in Commonwealth real property. The issue is whether the acquisition by Diana resulted in the acquisition by the Grizzards and Frank Ferreira of an equitable fee interest in Commonwealth real property and, therefore, the transaction violates Article XII.

The trial court erroneously applied agency principles in reaching its judgment. It is the law of trust that govern since only through trust principles may one acting as an agent acquire a fee interest. But although the substantive law applied was incorrect, the judgment is correct. The result we reach in applying principles of trust is the same as the trial court's result in applying principles of agency.

An appellate court has an obligation to determine if the judgment or order of a trial court is correct even if the wrong ground or reasoning was used. In re the Estate of Dela Cruz, No. 90-023, slip op. at 13, n.10 (N.M.I. Feb. 7, 1991); Ross v. Communications Satellite Corp., supra; Proctor v. State Farm Mut. Auto Ins. Co., 675 F.2d 308 (D.C. Cir. 1982), cert. denied, 459 U.S. 839 (1982).

In Restatement (Second) of Trusts § 440 (1959), it is stated that, "Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid, except as stated in §§ 441, 442, and 444." See also Aldan-Pierce v. Mafnas, No. 89-003, slip op. at 21 (N.M.I. July 5, 1991).

Is Diana a trustee for the Grizzards under a resulting trust theory? The answer is yes.

Disregarding the exceptions for the moment, what we have here is a transfer of three parcels of land to Diana with the entire purchase price being paid by the Grizzards. This creates a resulting trust under Section 440 of the Restatement (Second) of Trusts in favor of the one paying the purchase price. When Diana acquired the lots from the Mafnas sisters, Diana held bare legal title to the properties, and the Grizzards held equitable title. "The trustee of a resulting trust holds only the naked legal title for the benefit of the person furnishing the consideration . . . who holds the equitable interest." Aldan-Pierce v. Mafnas, supra,

526

at 22. (Citation and footnote omitted.)

In <u>Aldan-Pierce v. Mafnas</u>, <u>supra</u>, we held that

> If a resulting trust in real property in the Commonwealth has arisen in favor of a person who is not of Northern Marianas descent, it is subject to being declared invalid in a judicial proceeding if the equitable interest held for them in trust violates Article XII.

<u>Id</u>. at 34. (Footnote omitted.)

The most crucial evidence against Diana is the partnership agreement. This document not only establishes that Diana was never meant to be the fee simple absolute owner of the properties, but also dispels any exception to a resulting trust.

The undisputed facts show that the partnership among the four was formed to buy and sell or lease property. Each partner had a role. Diana was to purchase and hold title. The Grizzards were to provide the purchase money. Frank was to provide real estate expertise. Each performed their respective partnership roles.

The question is whether Diana possesses both legal and equitable titles to the properties, or whether she is holding title in trust for the benefit of all the four partners. If the latter, did the three partners not of NMI descent acquire an equitable fee simple interest in the properties? If so, such violates Article XII.

The Agreement clearly shows that Diana was to hold title to the properties for the benefit of the partnership. Agreement, Articles One and Four. There are three provisions in the Agreement

527

that conclusively show that Diana was holding title for the benefit of the partnership. The first provision is in Article Four. It states that any lease agreement to the partnership must include a "change of law" provision. The article defines "change of law" as meaning that the partnership (i.e., Diana, Frank, and the Grizzards collectively) will purchase the land in fee simple absolute should the law change with no additional consideration. Second, Article Four also states that Diana, or whoever is the lessor at the end of the lease period, must purchase the improvements placed on the land by the partnership, or whoever is the lessee then. And third, Article Five(3) provides that if Diana withdraws from the partnership for any reason, she must convey her right, title and interest in the land to a person of NMI descent, to be designated by the partnership.

These provisions establish an intent that Diana would obtain fee simple title, but subject to the partnership restrictions. She must convey her fee simple interest if 1) there is a change in the law, or 2) she decides to withdraw from the partnership. The consideration for her interest in the event of a change in law is the "mutual promises contained in this agreement." The consideration to be paid for her interest in the event she withdraws from the partnership "are the mutual promises contained in this agreement and one dollar ($1.00) to be paid in hand." She is restricted in what she may do with her title to the properties. And if none of the two conveyance possibilities arise, she must

purchase the improvements placed on the premises by the lessee at the end of the lease term.

██ Diana, James Grizzard, and Frank Ferreira disputed, in their depositions, that Diana was to obtain anything less than a fee simple absolute interest. However, these refutations do not prohibit a court from granting summary judgment. See United States v. Kasuboski, 834 F.2d 1345 (7th Cir. 1987). A party cannot circumvent summary judgment by later refuting what he or she initially admitted.

This is not a situation where a party to the Agreement is attempting to clarify or explain an ambiguous provision in the Agreement. What we have is a situation where parties to the Agreement are attempting to dispute what is clearly and unambiguously stated in the Agreement. This cannot, and should not, be allowed. Otherwise, the rule for summary judgment would be meaningless.

██ In Aldan-Pierce v. Mafnas, supra, at 34, n. 45, we noted that, "a trust may be rebutted by clear evidence that the money used to purchase the property was a valid gift, loan, or payment to discharge a debt or other obligation." In this case, we have no such clear evidence. Article Four of the Agreement shows that Diana was not to obtain title as a gift or loan, or to discharge a debt or other obligation. She acquired title because she was a person of NMI descent. She acquired title with covenants that she will relinquish her title upon the happening of certain events.

529

And if those specific events did not occur, her title was encumbered with the obligation to purchase any improvements placed on the premises by any lessee.

The exceptions to a resulting trust, as cited in Restatement (Second) of Trusts § 440, do not apply. These exceptions arise if the payor: (1) manifests an intention that no trust should arise (§ 441), (2) purchases the property in the name of a relative "or other natural object of bounty" (§ 442), or (3) purchases the property to accomplish an illegal purpose (§ 444). See also Aldan-Pierce v. Mafnas, supra, at 23.

There is no manifestation of an intention that no trust should arise. The Agreement makes it clear that a trust was contemplated. Agreement, Articles Four and Five. Diana is to purchase the property and then lease it to the partnership with a provision that if the law changes, the partnership obtains fee simple title at no additional consideration. She must purchase the improvements, if there is no change in the law, at the end of the lease term. Finally, she must transfer her interest if she ever decides to leave the partnership. It is clear that Diana's co-partners (who are not of NMI descent) have, through Diana's deed, acquired an equitable interest of indeterminate duration. This is not a situation where the non-NMI descent would be obtaining a constitutionally permissible interest. If the NMI descent was purchasing land with money totally provided by a non-NMI descent but it is clear that the intent in the transaction was that the

530

non-NMI descent would only obtain a 55 year lease, or less, and the fee interest would be in the NMI descent, then the constitutional prohibition would not be violated.[2]

██The Grizzards did not provide the funds for the purchase of the properties in the name of a relative or other natural object of bounty. Diana is not a relative of the Grizzards. There is nothing in the record establishing that she is a natural object of their bounty.

██Aldan-Pierce v. Mafnas, supra, at 23-24, discussed the third exception, i.e., a purchase to accomplish an illegal purpose.

At first blush, it appears that this exception may be applicable in this case. If the partnership agreement was entered into to accomplish an illegal purpose, there can be no resulting trust under § 444.

However, in analyzing Article XII, this Court has concluded in the Aldan-Pierce case that a violation of Article XII does not

---

[2]This hypothetical was also not the situation in the Aldan-Pierce case. We stated in Aldan-Pierce that "the record in this case indicates that Fennell and McMahon intended to retain an equitable interest of indeterminate duration." Aldan-Pierce v. Mafnas, supra, at 28.

We disagree with the dissent's interpretation regarding footnote 37 in Aldan-Pierce. See, infra, pp. 22-23. Footnote 37 was inserted under the discussion of a resulting trust being rebutted in part. Aldan-Pierce was arguing that, since Fennell and McMahon disclaimed any intention to take more than a leasehold for fifty-five years, the resulting trust is rebutted. Footnote 37 was inserted to show that the exception noted in Comment f of § 441 of the Restatement (Second) of Trusts does not apply in the Commonwealth if the disclaimer occurs after the unconstitutional act. That is, a person cannot violate the constitution now, and then later attempt to correct the violation by saying that all that was intended was a constitutionally permissible interest.

occur until and unless a court declares a transaction to be violative of Article XII. Therefore, there can be no automatic illegal purpose under Article XII. A court must first declare a transaction to be unconstitutional.

In adopting the principles set forth in Isaacs v. De Hon, 11 F.2d 943 (9th Cir. 1926), the Aldan-Pierce Court held that

> A resulting trust in real property in the Commonwealth in favor of a person who is not of Northern Marianas descent is valid, unless the equitable interest held for them in trust is declared, in a judicial proceeding, to be violative of Article XII. If the equitable interest is ruled violative of Article XII, the underlying transaction through which the person who is not of Northern Marianas descent acquired the interest becomes void ab initio. Article XII, § 6.

(Footnote omitted.) We reaffirm such analysis and holding on this exception. Only a court of competent jurisdiction can determine if an acquisition of land violates Article XII of the NMI Constitution. Prior to such judicial determination, the resulting trust is valid. This exception does not apply.

### Equal Protection

Diana's argument on this issue must fall.[3] Her brief, at 58, n.47, correctly notes that this argument was made to the United States Court of Appeals for the Ninth Circuit and was rejected.

---

[3]We disagree with the Mafnas sisters that this issue may not be raised on appeal since it was not raised in the trial court. This issue falls within one of the three exceptions noted in Camacho v. Northern Marianas Retirement Fund, No. 90-007, 1 N.Mar.I. 131 (Sept. 21, 1990). The exception is that "the issue is only one of law not relying on any factual record . . . ." Id. at 135-136.

See <u>Wabol v. Villacrusis</u>, 908 F.2d 411 (9th Cir. 1990).[4] There is no equal protection violation under the NMI Constitution, or the United States Constitution.

<u>CONCLUSION</u>

Based on the above, the conveyances from the Mafnas sisters to Diana violated Article XII of the NMI Constitution. The Grizzards acquired a constitutionally impermissible interest in real property in the Commonwealth when the conveyances were made. Such conveyances were void from the date they were executed.

The grant of summary judgment is hereby **AFFIRMED**.

Jose S. Dela Cruz
Chief Justice

Jesus C. Borja
Justice

---

[4]We note that we are agreeing only with the analysis of the Ninth Circuit on this issue.

KING, Special Judge (Dissenting):

I can readily agree with the Court's conclusion that some of the rights which James and Barbara Grizzard and Frank Ferreira sought to obtain in the San Roque land constituted permanent and long term interests in land. I accept also the majority's conclusion that the form of arrangement under which a person not of Northern Marianas descent (hereafter a "non-NMD") attempts to acquire control over, and a beneficial interest in, land in the Commonwealth is not dispositive. Thus, we are also in agreement that acquisition of any long term or permanent interest, whether legal, equitable or contractual, and whether held individually or through ownership of some form of business enterprise such as a partnership or corporation, falls within the constitutional prohibition. I therefore concur that the transaction between the Grizzards, Frank Ferreira and Diana Ferreira was violative of article XII of the NMI Constitution and was void _ab initio_.

Despite these important agreements however, I have serious misgivings about the Court's use of the resulting trust doctrine in this context and I find the ultimate conclusion unnecessarily and dangerously disruptive of economic and private property interests in the NMI. Because of the importance of article XII to the people and jurisprudence of the NMI, my reasons are set out here fully.

## I. The Resulting Trust Doctrine

The keystone of the Court's analysis in this opinion, and in

534

the recent case of <u>Aldan-Pierce v. Mafnas</u>, No. 89-003 (N.M.I. July 5, 1991) is the resulting trust doctrine. For the following reasons, I do not believe this doctrine is being properly applied by the Court.

## A. <u>Nature and Purpose of the Doctrine</u>.

The resulting trust doctrine is merely an analytic tool designed for the limited purpose of assisting courts to sort out the equities and relative rights between one who has furnished funds and one who holds the legal title as a result. G. Bogert, <u>Trusts</u> § 170 (6th ed. 1987) (hereafter, "Bogert, <u>Trusts</u>").

The court's attempt here to use the doctrine for the wholly unfamiliar purposes of determining whether article XII of the Constitution of the NMI has been violated and for enforcing the constitutional prohibitions against the parties who have provided funds for the purchase of land necessarily rips the resulting trust doctrine from its moorings. The attempt therefore is inherently suspect.

## B. <u>Key Principles</u>

Predictably, this novel effort has forced the Court to ignore or modify key aspects of the doctrine, and thereby to transmogrify the resulting trust doctrine itself.

1. <u>A resulting trust is to be invoked for the one who pays</u> - The resulting trust doctrine creates a trust "in favor of the person by whom the purchase price is paid . . . ." <u>Restatement (Second) of Trusts</u>, § 440 (1959). Bogert, <u>Trusts</u> § 35 at 128.

The Mafnas sisters did not pay the purchase price, but instead sold their property to Diana Ferreira and accepted payment from her. To permit sellers of land to invoke the resulting trust doctrine is unprecedented. To permit them to do so _against_ the supposed beneficiaries of the doctrine in order to _deprive_ those beneficiaries of any interest in the land they paid for, is a perverse misapplication of the doctrine.

2. **A resulting trust is not to be declared for an illegal purpose** - If the payment of funds and the agreement between the payor of the purchase price and the person who becomes the titleholder, are intended to accomplish an illegal or unconstitutional purpose, courts refuse to declare a resulting trust. Restatement (Second) of Trusts § 444 (1959); Bogert, Trusts §§ 48 and 74.

If the Grizzards and Frank Ferreira were to have asked this Court to declare the existence of a resulting trust as against Diana Ferreira their attempt to obtain the "constitutionally impermissible interest," slip op. at 18, necessarily would have been rejected. Since the payors are barred, there is simply no basis for declaration of a resulting trust.

3. **Illegal purpose does not furnish standing to third parties** - Some courts have had occasion specifically to consider the relationship between the law of trusts and statutory or constitutional prohibitions against land ownership by certain persons. The general rule is that such a prohibition precludes

536

equitable as well as legal interests. "If an alien has no capacity to take the legal title to land, he has no capacity to become beneficiary of a trust of land." Restatement (Second) of Trusts § 119, comment b (1959).

The lone exception occurs in a few states in the United States when land acquired by aliens is subject to forfeiture to the state. In those states, if the circumstances are such "that a resulting trust would arise if the payor were not an alien, a resulting trust arises in favor of the alien, and his interest is subject to forfeiture to the State." Restatement (Second) of Trusts § 444, comment f.

This limited right of the government to bring about forfeiture of an alien's claim through declaration of a resulting trust has not been extended to private parties. See Bogert, Trusts § 74 at 268 n.10, citing Kyodo Nishi v. Downung, 21 Cal. App.2d 1, 67 P.2d 1057 (1937). See also People v. Fujita, 215 Cal. 166, 8 P.2d 1011 (1932).

Refusal to permit private parties to invoke a resulting trust to the detriment of the beneficiary of such a trust is based upon sound and long standing principles of equity.

> Equity will never raise a resulting trust in favor of an alien . . . . To raise the trust, thereby forfeit the estate, would be to commit the offense, and make the alien bear the penalty . . . . [E]quity will never raise a mere resulting trust for an alien, that it may be forfeited . . . it will not profess to benefit, when it designs to destroy.

Hubbard v. Goodwin, 3 Leigh (30 Va.) 492, 512 (1887). See also Isaac v. Dehon, 11 F.2d 943, 944 (9th Cir. 1926). ("If the plaintiffs are aliens, appellant is in no position to take advantage of this circumstance. No one but the sovereign has any right to complain of a trust in real estate in favor of an alien disqualified to hold title.")

4. **Intention of parties must be considered** - The resulting trust doctrine is an "intent enforcing" doctrine designed to uphold the actual intent of the parties. Bogert, Trusts § 74 at 269. See also Restatement (Second) of Trust § 441 (1959); Id., comment f; cf. Isaac v. Dahon, 11 F.2d 943.

Yet, the Court in Aldan-Pierce, slip op. at 29, n.37, suggested that the resulting trust doctrine would apply in the NMI solely on the basis of the payment of the purchase price by non-NMDs, regardless of the intentions of the parties.

5. **Limited reach** - Since trust rights and obligations arise out of the relationships among the settlor, the trustees and the beneficiaries, the rights of third parties outside the trust normally are unaffected by the trust. Bogert, Trusts §§ 154 and 165. See also Restatement (Second) of Trusts § 287 (1959). In this case, the Court uses the resulting trust doctrine in conjunction with the constitutional prohibition. This combination expands dramatically the impact of a resulting trust, apparently reaching the interests of subsequent bona fide purchasers who acquired the land from or through Diana Ferreira.

## B. Logic and Analysis.

Inevitably, this effort to employ resulting trust analysis to determine the scope of article XII of the Constitution and to enforce the prohibitions has lured the Court into errors of logic and analysis, including circular reasoning[1] and unjustified adoption of legal fictions,[2] in addition to mere misuse of the resulting trust doctrine itself.

The Court in Aldan-Pierce, slip op. at 29, n.37, said it would apply the doctrine without regard to the intentions of the parties. This would transform the constitutional prohibition, placing in peril any joint venture in which land is acquired by funds furnished by non-NMDs. A broad array of possible short term and temporary arrangements would be barred while other transactions identical in substance but different in form would be permitted. Such fixation on the form rather than substance of transactions would be, I submit, entirely artificial and would bear no

---

[1] For example, the Court in Aldan-Pierce ostensibly was employing resulting trust analysis to determine whether the Constitution had been violated. Yet the basic principle that a resulting trust may be limited by agreement of the parties was swept aside on grounds of constitutional necessity. "Regardless, if this common law principle applied in the NMI, Article XII would effectively be nullified. We cannot presume that Article XII is a vain effort, or a nullity' and must interpret it to give it effect . . . . Therefore, this principal does not apply in the NMI." Slip op. at 28-29, n.37.

[2] "[A] violation of Article XII does not occur until and unless a court declares a transaction to be violative of Article XII. Therefore, there can be no automatic illegal purpose under Article XII. A court must first declare a transaction to be unconstitutional." Slip op. at 16.

relationship to the constitutional restrictions upon alienation or to their underlying purposes.

The majority opinion in this case indicates that the intentions of the parties will be considered. Slip op. at 14 and 15 n.2. This is a step in the right direction. Still, to the extent we do consider intention, the value of the resulting trust doctrine as a tool of analysis in article XII cases is diminished. Calling the rights of non-NMDs equitable interests by virtue of a resulting trust, rather than simply labeling them contractual rights, does not advance analysis. We are still faced with the difficult and exacting tasks of examining transactions on a case by case basis, defining with precision the scope of the article XII prohibitions, and determining whether the interests acquired by non-NMDs, be they legal or equitable title or be they contractual rights, are prohibited permanent or long term interests in Commonwealth land.[3]

Properly applied, the resulting trust doctrine also is not an apt tool for article XII issues because it may easily be evaded. Parties may avoid the doctrine simply by agreeing expressly that no

---

[3] Article XII, section 2 of the Constitution provides as follows: "The term acquisition used in section 1 includes acquisition by sale, lease, gift, inheritance or <u>other</u> <u>means</u>." (Emphasis added).

Thus, the form of the acquisition and of the interest itself is not dispositive. This Court has noted that the term embraces acquisition of equitable interests through trusts. <u>Aldan-Pierce</u>, slip op. at 17. The term also presumably includes contractual rights whereby a party acquires control over the use or disposition of land.

resulting trust will arise from their transaction or relationship or by casting the advance of funds for purchase of the land as a loan. Restatement (Second) of Trusts § 441.

In essence the resulting trust doctrine as used here is a "red herring," which has diverted the Court's attention from the real issues and pertinent sources of law. A primary issue in this case is whether the particular transaction involving the Grizzards and the Ferreiras violates article XII of the NMI Constitution. Resolution of this issue should turn upon the language of article XII, the underlying constitutional policies, and the understanding of the parties.

Instead of focusing upon the sources of legal guidance established by the people of the Commonwealth of the Northern Mariana Islands however, and carefully considering the agreements among the parties, the Court has looked far back to an obscure doctrine of the law of trusts which emerged from the mists of medieval England.

Finally, perhaps the most damning criticism of the use of the resulting trust doctrine in this case is that it has caused the Court to disregard completely another critical issue. The Court has simply assumed, based upon its finding of a resulting trust, that the sale of land by the Mafnas sisters to Diana Ferreira is part of the transaction to be declared void. As discussed at greater length infra, pages 37 to 46, the meaning of the term "transaction" in article XII, section 6 of the Constitution is of

541

far too great importance to constitutional jurisprudence in the NMI to be resolved without direct consideration.

## II.   Article XII of the Constitution of the NMI

Any governmental attempt, in a free society employing a free enterprise form of economic system, to prevent certain categories of persons from acquiring specified interests in land is inherently delicate and inevitably will present the courts with complex issues.  It would be futile here to attempt to provide a single solution which would purport to solve all of the problems that may arise.

However, there are certain key principles which should be kept in mind as the Court addresses article XII.

## A.   Key Principles

1.   **Full enforcement required** - First, it is important to recognize that restrictions on the alienation of land have uniformly been regarded as crucial to the "culture and traditions of the people of the Northern Mariana Islands," to their protection "against exploitation" and "to promote their economic advancement and self-sufficiency."  Covenant § 805.

Section 805(a) of the Covenant for twenty-five years mandates, and thereafter authorizes, the government of the NMI to "regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent."

The delegates to the Northern Mariana Islands Constitutional Convention, in implementing section 805 of the Covenant, made clear their own view that they regarded the restrictions as necessary --

> to protect the culture and traditions of the people of the Northern Mariana Islands, to promote the political growth needed in the first critical years of the Commonwealth, to accomplish the political union with the United States with a minimum of cultural and economic dislocation, and to provide the stability needed to survive in the family of nations.

Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands approved by the Delegates to the Northern Mariana Islands Constitutional Convention on December 6, 1976, at 164-65. Thus, this Court quite properly feels an obligation to accept and enforce the spirit of the constitutional prohibition against non-NMD acquisition of permanent and long-term interests in Commonwealth land. As the Court has said, the fact that "troublesome" difficulties may arise does "not permit us to disregard the mandate of Article XII." Aldan-Pierce v. Mafnas, slip op. at 36.

2. Reconciliation necessary - As we recognize the importance of article XII however, it is equally crucial to bear in mind that article XII is but one of numerous provisions, and must be reconciled with the other provisions, in the Constitution of the NMI. Nowhere is it written that article XII is to override any other part of the Constitution. Certainly there can be no suggestion that article XII, restricting the rights of NMDs to

alienate land, should be read as overriding article I, the personal rights article of the Constitution.

Thus, when we are presented with a claim that a particular transaction violates the restrictions on alienation and therefore is void ab initio, we must also remember that "no person shall be deprived of . . . property without due process of law," NMI Const. art. I, § 5, and that "no person shall be denied the enjoyment of civil rights or be discriminated against in the exercise thereof on account of race, color, . . . [or] ancestry . . . ." NMI Const. art. I, § 6.

Obviously, there is a tension among these provisions. The right of a landowner to alienate his or her land, and the landowner's right to control the use of that land, are normally thought of as core rights of ownership protected under language such as that employed in the due process clause of article I.[4] Similarly, the rights to acquire, possess and alienate land have

_____

[4] The Supreme Court of the United States has long recognized that owners of land are free to control, use, and alienate their interests. In Sexton v. Wheaton, 21 U.S. 229, 239, 5 L.Ed. 603, 607 (1823) Chief Justice Marshall said that "[i]t would seem to be a consequence of that absolute power which a man possesses over his own property, that he may make any disposition of it which does not interfere with the existing rights of others, and such disposition, if it be firm and real, will be valid." That the right to alienate property is one of the rights an owner inherently possesses over property was again recognized in Bean v. Patterson, 122 U.S. 496, 30 L.Ed. 1126, 7 S.Ct. 1298 (1887).

More recently, the Eleventh Circuit Court of Appeals found that "the right to transfer possession of property is an important attribute of ownership" which is protected by the due process clause of the fifth and fourteenth amendments. Peterman v. Coleman, 764 F.2d 1416, 1419 (11th Cir. 1985).

also been numbered among those basic rights which historically have been considered fundamental civil rights qualifying for equal protection.[5]

Our task of course must be to reconcile, and give effect to, both sets of provision. In doing so, we must recognize that the article XII restrictions on alienation inherently impinge upon the article I protections of due process and equal protection to purchase, lease, sell, hold and convey property. To the extent the article XII restrictions are expanded, the rights available under article I are commensurately reduced.

In light of this inherent tension and the necessity for careful reconciliation, article XII must be read cautiously and applied with precision so as to minimize the encroachment upon article I rights.

3. **Least restrictive means of enforcement** - In most free

---

[5] In <u>Cornfield v. Coryell</u>, Fed. cas. No. 3,230 (Cir. Ct. E.D. Pa. 1823), <u>quoted</u> in G. Stone, L. Seidmen, C. Sunstein and M. Tushnet, <u>Constitutional Law</u> 334 (1989), Justice Bushrod Washington, discussing the privileges and immunities clause of article IV of the United States Constitution, said that clause protects interests which are "fundamental; which belong, of right, to the citizens of all free government." These, he said, may all be comprehended under the following general heads: "Protection by the government, the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject nevertheless to such restraints as the government may prescribe for the general good of the whole." Long-standing civil rights legislation in the United States also singles out the rights to buy and sell real property as core civil rights. "All citizens [shall] have the same right, in every State and Territory, as is enjoyed by white citizens thereof, to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

countries citizens take for granted the rights to buy and sell private land and to use that land as they choose so long as the form of use does not impinge upon the rights of neighbors or the general community. Valid reasons underlie article XII restrictions of these rights in the NMI. However, it should be understood that the restrictions themselves, precise and narrowly drawn, reflect no broader or deeper constitutional intent to render evil, suspect or improper, efforts to exercise whatever rights do remain outside the prohibitions.

Constitutional history confirms that we are to limit our enforcement role to the restrictions stated in the Constitution itself. The Analysis adopted by the Constitutional Convention in 1976 explains and emphasizes the thinking of the Convention that land in the NMI provides for the people of the NMI "unique social and economic benefits," which would be lost "if the land passes out of the hands of the people of the Northern Mariana Islands." Analysis, at 165. However, the Convention did not invite the Courts to set off on a wide-ranging search for the best specific ways to uphold the underlying purpose. To the contrary, the Analysis makes clear that the Convention saw the importance of accomplishing its goals in the least restrictive manner possible. The Convention was at pains to identify the specific restrictions in article XII: "[T]he Convention spent a great deal of time and effort to find the least restrictive means of accomplishing its purpose." Analysis of the Constitution of the Commonwealth of the

Northern Mariana Islands, supra, at 166.

We are constitutionally bound, I submit, to respect the importance placed by the Convention upon its own work in spelling out the "least restrictive means" to carry out the constitutional purpose of preventing the land from passing out of the hands of the people of the Northern Mariana Islands. We must avoid the temptation to expand article XII beyond these "least restrictive means" identified by the framers.

In other words, while article XII prohibits non-NMD persons from acquiring leasehold rights extending more than fifty-five years, it does not prohibit, or even frown upon, a lease precisely fifty-five years in length. While the article prohibits non-NMDs from acquiring permanent and long term interests in land it does not restrict NMDs from conveying to non-NMDs lesser, nonfreehold interests in Commonwealth land or from permitting non-NMDs to exercise broad, almost complete control over land in the Commonwealth for shorter periods of time.

Moreover, nothing in the Constitution or in the constitutional history suggests that this Court is designated to ferret out and punish attempts by non-NMDs and NMDs to enter into transactions which we may perceive somehow as contrary to the spirit of article XII even though not actually prohibited by the language of the article.

Specifically, nothing in these sources of law hints of a constitutional directive that we should expand or modify other

547

concepts, such as the resulting trust doctrine, and superimpose these altered doctrines over the article XII restrictions in order to outlaw arrangements which are not directly prohibited by article XII but which we believe should have been prohibited.

Finally, although the United States Court of Appeals for the Ninth Circuit has characterized the land alienation restrictions as a "paternalistic" attempt to prevent NMDs "from selling their cultural anchor for short-term economic gain,"[6] there is nothing to suggest that this Court is authorized to extend the reach of article XII to protect NMDs by setting aside transactions on the grounds that this Court sees no reason why a reasonable NMD who was not misled by a non-NMD would have entered into the agreement. Various common law doctrines protecting against undue influence, fraud or misrepresentation, and against enforcement of unconscionable contracts, are the proper tools for that kind of work.

## B.  A Proposed Mode of Enforcement for Article XII

Thus, our mandate is a narrow one.  We are to declare void ab initio those transactions whereby a non-NMD acquires a permanent or long-term interest in real property.  We may not do this by attempting to divine the "spirit" of the constitutional prohibition.  Article XII is what it is and we must enforce it as it is.

The apparent way for the Court to do this would be to

---

[6]  Wabol v. Villacrusis, 908 F.2d 411, 423 (9th Cir. 1990).

scrutinize carefully any transaction entered into by a non-NMD person to determine whether the transaction would result in acquisition of a long term interest by a non-NMD person, or in having the land pass out of the hands of the people of the NMI.

The obvious way to begin considering whether a transaction between NMDs and non-NMDs violates article XII is to examine any written agreements between the parties. If the agreement is a lease, for example, it seems clear that the term of the lease would be the primary, probably even the only, determinant. Normally, if the term of the lease is 55 years or less, the leasehold could not be violative of article XII.

Of course, it may often be necessary to extend analysis beyond the stated term of the lease. If, for example, the lease contains an option to renew or extend the lease beyond 55 years, or if it is agreed that title will vest in the lessee or pass out of the hands of NMDs in the event of some future contingency which is not within the control of the NMD, then presumably the agreement would be unconstitutional. Any "secret" agreements, whether oral or written, should be brought to light and included in the analysis of the transaction.[7]

Because I agree with the majority that article XII, section 2

---

[7] Legislative adoption of disclosure requirements, mandating that any acquisition of an interest in land by a non-NMD be in writing and registered in public records, could be of immense assistance to the enforcement effort. Establishment of a public enforcement agency to investigate and challenge questionable transactions could also be useful.

of the NMI Constitution means that the form of the interest is not dispositive, I interpret "permanent and long-term interests" as including the acquisition of any contractual or other legal interest, in whatever form, whereby a non-NMD, or the non-NMD's successor or agent, may control use of the land beyond fifty-five years. Similarly, any agreement whereby a non-NMD could extend the non-NMD's rights beyond fifty-five years, or pursuant to which an NMD would be stripped of the NMD's interest in the land, upon the occurrence of conditions subsequent which are outside the control of the NMD, or without independent assent by the NMD, would render the transaction violative of article XII.

Although I am persuaded, for the reasons already stated, that the resulting trust doctrine itself may not be used against the intended beneficiary of that doctrine as a means of enforcing article XII against that person, the Court may of course consider any aspect of the transaction, including the source of funds used to acquire the land in question.

Certainly the fact that a non-NMD provided funds for the purchase of land in the Commonwealth, title to which is placed in an NMD, is significant, although not conclusive, evidence that the non-NMD has attempted to acquire an interest in that land. If the non-NMD is shown to have supplied all, or nearly all, of the purchase price, this might even justify a rebuttable presumption that the non-NMD through this transaction with the NMD has attempted to acquire a permanent or long term interest in the land

so purchased. It would then be incumbent upon the non-NMD to show that this transaction is not violative of article XII.

## C. The Proposed Method Applied to This Transaction.

Applying these principles to the factors identified in the majority opinion as showing "that Diana was to hold title to the properties for the benefit of the partnership," slip op. at 11, I have no difficulty in finding the transaction violative of article XII.

1. **The "change of law" provision** - Article four (1) of the 1980 partnership agreement provides as follows:

> Upon the purchase of the described real property, partner Diana C. Ferreira will execute a lease of the real property to the partnership, for the maximum period of time allowed by law, being forty (40) years and to include a "change of law" provision for purchase in fee simple absolute should the law change with the consideration for this provision being the $41,000 paid in hand and the mutual promises contained in this agreement.

This change of law provision is an attempt by the non-NMD partnership presently to acquire the contractual right to receive a permanent freehold interest in the land, and to require the land to pass out of NMD hands, contingent only upon the happening of a future event which is outside of the control of the NMD. I would hold such a provision to be unconstitutional.

2. **Purchase of improvements** - The majority also points to the article IV requirement that Diana, or whoever is the lessor at the end of the lease period, must purchase the improvements placed on

551

the land by the partnership, or whoever is the lessee then.

I am unable to perceive any constitutional difficulty with such a requirement. Indeed, since the NMD would retain title to the land at the end of the forty years, and would also become the owner of the improvements on the land at that time, I regard this provision as entirely consistent with the purposes of the Constitutional Convention in drafting of article XII.

3. **Withdrawal** - The third provision pointed to by the majority, article five (3), says that, "In the event Diana C. Ferreira desires to withdraw from the partnership for any reason, she hereby agrees to assign all her right, title and interest to the real property to a [NMD] who will be designated by the partners and selected as a new partner."

Although this is a closer question, I do not consider this provision to be unconstitutional. The NMD's promise to transfer her interest is itself limited to forty years and is enforceable only if she "desires," i.e. voluntarily decides, to withdraw from the partnership. Moreover, even after the transfer the title would remain in NMD hands. Therefore, I see no constitutional violation in this requirement.

4. **The quitclaim requirement** - There is one more provision, unmentioned in the majority opinion, which I see as unconstitutional. In article five (3) of the agreement the parties agree as follows:

In the event the sale, lease or development of the first

two lots is sufficient to generate enough income to pay all partners the amount of their initial capital investment the remaining three lots will be disposed of as follow: "J&B" will quitclaim all of their right title and interest in one lot to partners "F&D". "F&D" will quitclaim all their right, title and interest in one lot to "J&B" . . . .

This requires Diana, the NMD and sole titleholder of this land, to quitclaim her entire interest in the lot to "J & B" who are non-NMDs. A quitclaim deed executed by an NMD who is the sole titleholder of the land would effectively vest title in the non-NMD as against the entire world and would cause the land to pass out of the hands of all NMDs. Nobody, including the grantor, could challenge the non-NMD's claim of ownership. The quitclaim requirement is an immediate, fixed obligation, subject only to a condition which is not under the control of the NMD. This provision is therefore violative of article XII both because it is an attempt by non-NMDs to acquire a permanent interest in land and because it is an attempt to require the land to pass out of NMD hands, subject only to the happening of a future event which is outside the control of the NMD titleholder.

Thus, I agree with the majority that the agreement between the Grizzards and the Ferreiras is unconstitutional.

### III. The Transaction To Be Voided

The majority suggests that the conclusion that the partnership agreement violates article XII requires a holding that "the conveyances from the Mafnas sisters to Diana . . . were void from

553

the date they were executed." Slip op. at 17. Although this important aspect of the decision is not discussed in the majority opinion, the Court's holding presumably is based upon a view, or assumption, that the sale of land from the Mafnas sisters to Diana is the transaction, or part of the transaction, that must be declared void ab initio pursuant to article XII, section 6 of the Constitution.

Interpretation of the word "transaction" in section 6 is of grave importance to the implementation and impact of article XII. This crucial issue should not be decided without careful identification of the options available and consideration of the effects likely to flow from the interpretation selected. In Aldan-Pierce, this Court acknowledged that decisions under article XII could have a disruptive effect on land and business matters.

> We are . . . concerned with the possibility that a decision in favor of Mafnas may "unleash chaos into the Northern Marianas land title system and economy." Appellee's brief at 43. We note that our ruling might pose problems for land title researchers, who must now ascertain whether a conveyance of the sort we rule invalid in this case has occurred in the chain of title of tracts of Commonwealth real property. An infirmity may not be immediately apparent in land records. We also note amicus' concern that our decision may create difficulties with respect to loans secured by real property, title to which may be constitutionally tainted.

Id. at 35-36. In Aldan-Pierce, the Court correctly concluded that such difficulties "do not permit us to disregard the mandate of article XII." Id. at 36.

The plaintiff in Aldan-Pierce was seeking specific enforcement

554

of an option agreement requiring an NMD to convey his land to the plaintiff. An action for specific performance is an equitable action and courts typically deny such relief if the requesting party comes into court with "unclean hands." D. Dobbs, Remedies § 12.10 (1973). A refusal to grant specific performance flows naturally from the Court's conclusion that the parties seeking specific performance were attempting to obtain such relief in order to implement an unconstitutional scheme. Given the finding of unconstitutionality, the Court's enforcement decision in Aldan-Pierce was indisputably correct and was uncontroversial.

More to the point, the Court's refusal to enforce the option in Aldan-Pierce did not pose any of the risks referred to by the Court in the language quoted above. Title to the land involved in that case already was in the name of the defendant, Mr. Mafnas, and the Court's refusal to force him to convey the land did not create any confusion in the land records.

Yet the Court's observation about potential dangers lurking in article XII, section 6 of the Constitution surely was correct. Some possible methods of enforcing article XII could indeed "unleash chaos" in the NMI. It is therefore incumbent upon us to approach enforcement issues with the utmost caution and balance.

In this case, the circumstances are quite different than in Aldan-Pierce and the potential for chaos is much greater. Here, we are not being asked to enforce article XII just by protecting an NMD from being forced to convey title, nor even just by divesting

555

non-NMDs of their unconstitutional interests in land. Instead the Court contemplates stripping one NMD, Diana Ferreira, of her title to land in order to restore the previous ownership of other NMDs, who voluntarily sold the land at a mutually agreed price and without any knowledge of Diana's unconstitutional agreement with her non-NMD partners.

Moreover, the record indicates that the Grizzards and Ferreiras have already entered into agreements with third parties who have attempted to acquire interests in the land. Thus, this case itself may eventually serve to illustrate the inescapable truth that broad interpretations of the term "transaction" can inject untold confusion into the land title system of the NMI. This is so in part because of the multiplier effect inherent in the broad interpretation itself. The broader the application of the term, the greater the number of agreements and actions to be declared void and set aside.

More than that however, this Court's adoption of an expansive interpretation of the term transaction would deprive the law of predictability. If the term is expanded to include agreements entered into by parties who have no reason to know that their apparently legal agreement is somehow related to an attempt by non-NMDs to acquire a prohibited interest in land, literally no person and no agreement will be secure.

In the instant case, perhaps the Court regards the agreements between the Mafnas sisters and Diana Ferreira as part of the

"transaction" to be declared void on the theory that the deed to Diana Ferreira created a resulting trust in non-NMDs. The other possible theory is that the conveyance of land to Diana Ferreira was a necessary and integral part of the implementation of the Ferreira-Grizzard partnership agreement, and therefore, because of this close logical relationship, should be considered part of their transaction.

In any event, the salient point is that when they executed their deed, the Mafnas sisters apparently had no knowledge of the attempts of the non-NMDs to acquire interest in the land. There is no indication that they were aware of the existence of the partnership agreement between the Ferreiras and the Grizzards, and of course there is no showing that they knew of any of the specific provisions which rendered the agreement unconstitutional. To say, nonetheless, that they were part of the unconstitutional transaction is to take an extraordinarily expansive view of the term transaction.

Thus, what the Mafnas sisters entered into willingly and believed was a perfectly valid arrangement has now been declared void by the Court. While the declaration of voidness apparently redounds to the benefit of the Mafnas sisters in this case, it should be remembered that the void _ab_ _initio_ provision can work both ways. Presumably, if the Mafnas sisters had negotiated an exceptionally good deal and if Diana Ferreira subsequently had decided she wanted to renounce the agreement, she could have had

the sale of the land declared void under the same theory.

There is no apparent purpose to be served in exploring all of the possible results of such a broad interpretation of the term transaction. What is clear is that if this Court upholds a rule which permits the voiding of agreements entered into by persons who have no knowledge and no reason to know of the unconstitutionality of their agreements or indeed even of the possibility that the agreements are logically or practically related to the acquisition of a forbidden interest by a non-NMD, some persons may reap windfalls, and others may suffer catastrophic losses, while the courts and lawyers spend years and valuable resources trying to sort through the mess. All of this would happen arbitrarily. The results would not necessarily bear any relationship to the purity or illegality of the intentions of the parties when they enter into their respective agreements.

It is important to avoid such a situation. Instead, this Court must strive to establish a straightforward understandable interpretation of the term transaction and the interpretation must, insofar as possible, avoid injecting confusion into the great mass of business transactions entered into in the NMI.

In any normal sense, the transaction in this case which is unconstitutional must be only the partnership agreement whereby the non-NMD sought to acquire forbidden interests in land. It is only this agreement, I submit, which should be held void ab initio. Although the constitutional history is sparse, that which is

558

available supports this way of interpreting the term transaction. The Analysis of the Constitution says, at page 178:

> This section provides that any transaction made in violation of section 1 is void from the beginning and has no force or effect. This means that if a person sells land to a [non-NMD], that transaction never takes effect and never has any consequences with respect to the title of the land. The title remains in the person who tried to sell it. . . .

This Analysis confirms that in speaking of the "transaction," the Convention had in mind direct dealings between the non-NMD, and the NMD who "tried to sell" the land to the non-NMD. There was no indication that the term transaction was to include the NMD's ancillary or related dealings with other persons, who act without knowledge of the attempt of the non-NMD to acquire a forbidden interest.

It bears emphasizing that the example used in the Analysis does not say, or imply, that the NMD who "tried to sell" land to a non-NMD should be punished. The example reflects the convention's expectation that the title would be restored to the NMD who had dealt directly with the non-NMD. As the Court of Appeals for the Ninth Circuit noted in Wabol, article XII is paternalistic, not punitive. 908 F.2d at 423. The restraints on alienation are designed to protect, not punish NMDs, and this protection extends to, indeed has been erected especially for, NMDs who enter into transactions with non-NMDs.

The goal of article XII is to preserve "unique social and

559

economic benefits" flowing from land ownership by assuring that the land does not pass "out of the hands of the people of the Northern Mariana Islands." Analysis of the Constitution at 165. That purpose is fully served by declaring void the partnership agreement between Diana Ferreira and the non-NMDs. Plainly, we have no mandate from the framers to go to extraordinary lengths to assure that Diana Ferreira is punished and deprived of the benefit of her transaction with the Mafnas sisters, merely because that transaction bears a logical connection to Diana Ferreira's unconstitutional transaction with non-NMDs.

One last aspect demands consideration. This quiet title action originally was brought by Diana Ferreira in an effort to satisfy conditions posed to her by Nansay Micronesia, Inc. in connection with Nansay's lease of the land from her. Prior to entering into that agreement with Diana Ferreira, Nansay had paid $1.1 million to non-NMDs, the Grizzards, in exchange for their assignment to Nansay of their interests in the land and under the partnership agreement. Ultimately, it appears that Diana Ferreira, who invested nothing of her own in this transaction, is to receive in excess of $2 million. Of course, if this Court should declare all of the transactions, including the conveyances from the Mafnas sisters to Diana Ferreira, void _ab_ _initio_, serious questions may be raised as to the right of Ms. Ferreira to receive that money.

On the other hand, if this Court declares only the partnership agreement between the Grizzards and the Ferreiras to be void, it

560

seems as though such a declaration will have little actual impact upon the parties involved here and the land will be used in ways and by persons unaffected by our ruling. There can, of course, be legitimate concern then that a ruling restricting the article XII, section 6 term transaction to the partnership agreement itself effectively renders the constitutional prohibition a nullity.

In my view, this concern is not well founded. It is important to bear in mind the limited purposes of article XII, to prevent the land of the Commonwealth from passing out of the hands of the people of the Northern Mariana Islands and to protect NMDs in their dealings concerning land with non-NMDs.

In this case, if we declare the partnership agreement void, we will have alerted non-NMDs and NMDs that they cannot rely upon or enforce any part of a transaction in which they know the non-NMD is attempting to acquire a permanent or long term interest in land in the Commonwealth.

Land would not pass out of the hands of the people of the Northern Mariana Islands as a result of such a decision. Finally, although Diana Ferreira is protected by the principle enumerated in article XII, section 6 and could at any time have renounced any aspect of the partnership agreement, her voluntary adherence to her commitments is not surprising. She has quite understandably concluded that she fared very well in this particular venture. Just as we are not designated to punish Diana Ferreira for entering into an agreement with non-NMDs, there is no occasion here for us

to rush to her protection.

## IV. Conclusion

The restrictions upon alienation specified in article XII of the NMI Constitution have been carefully designed to accomplish purposes of crucial importance to the people of this Commonwealth while minimizing disruption, and impingement upon other rights. These "least restrictive means," identified by the framers, must be fully and firmly enforced but we may not expand them in the name of judicial creativity. For all of the reasons stated, I believe this Court should eschew the resulting trust doctrine and fashion an analysis derived specifically from article XII and its constitutional history.

Nevertheless, in this particular case, I agree with my colleagues that the partnership agreement represents an attempt by a non-NMD to acquire an unconstitutional interest in land of the Commonwealth and is therefore void _ab_ _initio_. However, I do not believe that this decision should have any bearing whatever upon the prior and separate agreement of the Mafnas sisters to sell their land to Diana Ferreira and I see no basis whereby their sale of land to her should be held void. I believe she should prevail in the quiet title action and I therefore respectfully dissent.

EDWARD C. KING, Special Judge